## COST OF GAS CONNECTIONS FOR CINCINNATI.

Common Pleas Court of Hamilton County.

CITY OF CINCINNATI V. THE UNION GAS & ELECTRIC COMPANY.

Decided, May 6, 1913.

*Municipal Corporations—Construction of Natural Gas Ordinance for Cincinnati with Reference to Cost of Connections to City Lamps— Custom of the City in Paying for Such Connections Not Binding.*

1. Under the ordinance granting to the Cincinnati Gas & Electric Company the right to furnish natural gas for heat, light and power and all other necessary uses to both public and private consumers, the gas company is required to construct at its own expense service pipes from its mains to the inside curb lines at least, and the city as well as private consumers is entitled to the benefit of this provision.
2. The provision of Section 3 of the "Conover contract," which puts upon the city the expense of service pipes connecting with street lamp posts, has not been made a part of the natural gas ordinance under which natural gas is now being furnished to the city.
3. The fact that the city has heretofore paid for such service connections made since the passage of the natural gas ordinance, does not estop it from raising the question of its obligation to continue so doing, and under the rule that it is against public policy to permit public officials to bind the municipality as to the manner in which its ordinances shall be enforced, the question may be litigated without reference to previous custom.

*Alfred Bettman,* City Solicitor, for plaintiff.
*Miller Outcalt,* contra.

MAY, J.

The city of Cincinnati filed its petition in this cause setting up the two ordinances passed by the city council of the city of Cincinnati on December 26, 1905, to-wit, No. 1222, authorizing the Cincinnati Gas & Electric Company to supply natural gas for the purposes of heat, light and power and all other necessary uses by both public and private consumers; and ordinance No. 1223, regulating the price to be charged by the gas

company for natural gas for and during the ensuing ten years.

By virtue of the first ordinance the gas company was granted the right to furnish and supply natural gas for the purposes of heat, light and power and all other necessary uses by both public and private consumers, and to use its existing gas mains and pipes which were then in the public streets and ways for that purpose. The object of the grant was to enable and require the company as far as practicable to use its present gas pipe system and so avoid as far as may be the necessity of opening and disturbing the public ways. and grounds for the supplying the city and its inhabitants with natural gas for the purposes and usages herein named, provided that this grant is made and may be accepted without prejudice to any of the rights and obligations of the company under any of its existing contracts with or privileges from the state of Ohio or the city to supply either artificial gas or electricity. One of the conditions in the grant as set out in the ordinance was to the effect that the company shall supply natural gas through existing service pipes wherever practicable and wherever impracticable shall at its own expense construct service pipes from its mains at least to the inside curb lines, the consumers to construct and extend them thence into their premises at their own expense. The grant was to continue for twenty-five years from and after its passage and acceptance of the ordinance, subject to the right of the city to regulate the price of natural gas from time to time as provided by law.

Ordinance No. 1223, as set out in the petition, fixes the price of natural gas for the period of ten years from the passage of the ordinance and acceptance by the company, by the terms of which the company may charge for natural gas furnished the city of Cincinnati for street lighting and other purposes and to private consumers at a rate of forty cents per thousand cubic feet, making a net rate of thirty cents per thousand cubic feet.

The petition further alleges that the ordinances were passed and accepted by the company and that the company leased its plant to the Union Gas & Electric Company for a term of ninety-

nine years, and that the Union Gas & Electric Company assumed the operation of the gas and electric business and all obligations of the Cincinnati Gas & Electric Company to the city of Cincinnatil and its inhabitants.

The city further alleges that on or about the 15th day of November, 1912, through its director of public service duly authorized by the city council, it installed two gas lamp posts on Willard avenue, a public street of the city, with all the necessary appurtenances and appliances including service pipes from the lamps to the inside curb line of the street, and that the defendant company has installed and maintains a gas main along Willard avenue through which it can and does supply gas for lighting purposes; that all that remains to be done, in order that natural gas of the defendant company's supply may be transported and conducted to the city gas lamps on that street, is the construction of a service pipe from the defendant company's main on said street to the service pipes which the city has constructed to the inside curb lines; that the city requested and demanded the gas company to supply natural gas through its gas mains on Willard avenue to said public lamps and that the gas company construct the necessary service pipes from the main to the said service pipes to the inside curb lines at the gas company's expense; that the company refuses at its expense to construct these service pipes to the inside of the curb line and refuses to supply natural gas for street lighting purposes to said gas lamps until the city of Cincinnati shall have itself constructed at the city's expense said service pipes from the main to the inside of the curb line.

The city further alleges that among the costs and expenses of the installation of said service pipes is the cost and expense of making openings in the street and restoring the surface and paving of such street and that according to the ordinance of the city of Cincinnati, any corporation making such openings is required to deposit with the treasurer sufficient money to cover the costs of restoration and that the defendant company refuses not only to construct and install said service pipe, but refuses to pay the cost of restoration.

·The city prays for an order of mandatory injunction against the Union Gas & Electric Company, ordering it to supply natural gas for lighting purposes to the gas lamps on Willard avenue at the rates fixed by council, and for an order requiring the gas company to construct the necessary service pipes from its gas main on said street to and connecting with the service pipes of the city inside of the curb line, and to pay all costs of restoring the surface and paving of the street after making the openings, and for an injunction restraining the company from exercising and operating under its franchises until it complies with the order.

The gas company by its answer admits all the allegations in the petition regarding the ordinances 1222 and 1223, and the request of the city to construct the connection from the main to the inside of the curb line of the avenue, and by way of defense alleges, as the natural gas ordinance provided, "that this grant is made and may be accepted without prejudice to any of the rights or obligations of the company under its existing contracts with, or privileges from the city of Cincinnati or state of Ohio, to supply either artificial gas or electricity."

The defendant further sets up in its answer that among the existing contracts at the time of the passage of said ordinance No. 1222 with the city, there was an ordinance known as the "Conover contract," which was originally passed June 16, 1841, and re-enacted August 23, 1854, and that by Section 3 of that ordinance it was provided as follows:

Section 3. "Conover to furnish gas to city at certain rates. That in consideration of the privileges hereby granted to the said Conover, his associates, their heirs, and assigns, and successors, they, the said Conover, his associates, their heirs, assigns or successors, shall furnish to the city on the several streets, lanes, commons, and alleys in which the leading or main pipes for supplying the citizens with gas light shall be laid and in use, such quantity of gas as may be required by the city council for public lamps at two-thirds of the lowest average price at which gas shall or may be furnished to private individuals in the cities of New Orleans, Baltimore, New York, Louisville, and Pittsburgh, the lamp-posts, connecting pipes, meters, and lamps, being furnished by and at the expense of the said city."

The gas company further says that ever since the passing of said ordinance known as the "Conover contract" and its acceptance and operation thereunder, the gas company. has laid and constructed the connecting pipes between its mains in the street and public grounds of the city of Cincinnati and the lamp posts therein at the expense of said city, and that it is at all times and is now ready and willing to lay and construct said connecting pipes between said mains and said lamp posts in accordance with the terms of said ordinance and not otherwise.

.The city filed a reply in which it set out in full the entire Conover contract, and denies the allegations in the answers, except as to the admissions of Section 3 of the Conover contract.

At the hearing it was admitted that since the passage and acceptance of the natural gas ordinance, the gas company has made the connections between its mains and the inside curb line for street lighting purposes at the expense of the city, and that no objection to this charge was raised until the present director of public safety objected in April, 1912, to the charge.

The city contends that under the Ordinance 1222 it is a public consumer and that the gas company must furnish the connections from the mains to the inside curb line in accordance with the provisions of the third section of said ordinance, to-wit, that, "said company shall supply natural gas through existing service pipes wherever practicable, and where impracticable it shall at its own expense construct service pipes from its mains at least to the inside curb lines." It further contends that the proviso that "this ordinance is made and may be accepted without prejudice to any of the rights or obligations of the company under any of its existing contracts with or privileges from the city of Cincinnati or the state of Ohio, to supply either artificial gas or electricity," has reference only to any obligations regarding the supply of artificial gas or electricity and can not apply to the present ordinance under which natural gas is being furnished.

The gas company contends that this proviso has special reference to the third section of the Conover act by which the rate of gas for city lighting was fixed and by the terms of which the .

city was to make all the connections between the mains and the lamp-posts.   And the gas company further contends that because of the conduct of the city officials in always paying for these connections there is an estoppel on the part of the city to raise the question at this time.

I am of the opinion that the latter contention is not well taken. It is well settled law that the conduct of a public official regarding a public act can not bind any succeeding public official for the reason that it would be against public policy.

The question then is, whether by the terms of the natural gas ordinance, Section 3 of the Conover contract is embodied in it so as to obligate the city to pay for the connections between the gas mains in the streets and the lamp-posts on the sidewalk. A careful reading of the entire ordinance, in my opinion, does not sustain this claim.   Ordinances granting franchise privileges must be strictly construed in favor of the city and against public service corporations who receive the grants.

The proviso referred to as set out in Section 1 of Ordinance 1222 reads:

"Provided, that this grant is made and may be accepted without prejudice to any of the rights or obligations of the company under any of its existing contracts with or privileges from the state of Ohio or the city to supply either artificial gas or electricity."

Giving these words their natural meaning, and bearing in mind the usual rule of strict construction in matters of public franchises, this proviso can only refer to any obligations or rights in any contract for the supplying of either artificial gas or electricity, and in the absence of any obligations on the part of the city in the ordinance granting natural gas franchises requiring the city to pay for the connections between the mains and the inside curb line, and in the face of a special provision in Section 3 of that grant requiring the company to construct at its own expense service pipes from its mains at least to the inside curb line, it necessarily follows that the company operating under these ordinances is required to make these connections, if the city can show that it is entitled to the service under that

ordinance.   It can not be disputed that the city is entitled to
be furnished with natural gas by the terms of this ordinance
No. 1222.   The caption of the ordinance reads:

"To authorize the Cincinnati Gas & Electric Company to
supply natural gas for the purposes of heat, light and power
and all other necessary uses by both public and private con-
sumers." ·

The words "public and private" are used throughout the
whole ordinance.   The city undoubtedly is a public consumer,
and when reference is made to Ordinance 1223, fixing the rate,
it will be noticed that the rate of the city as a public consumer
is the same as that made to private consumers.   Section 1 of
the rate fixing ordinance reads:   "Said company may charge ·
for natural gas furnished to the city of Cincinnati for street
lighting and all other purposes, and to *private* consumers."
This places the city in the same position as private consumers.

It is contended by the gas company that inasmuch as the ob-
ject of the ordinances was to permit the company to use its
existing system as far as ·practicable, with the provision in Sec-
tion 3 requiring connections to be made only where it is im-
practicable to furnish gas, refers only to private consumers.
This is a forced construction, because said Section 3 contains no ·
words restricting the construction of service pipes from its mains
at least to inside curb lines to private consumers.   The word
used is "consumers," and this necessarily must apply to both
public and private consumers.

It is likewise urged that because the provision is, "the con-
sumers to construct and extend them (service pipes) thence into
their premises at their own expense," can only refer to private
consumers because a lamp-post can not be construed premises.·
It is sufficient answer to say that there is no restriction, and
that if the gas company had thought this did not apply to
the city, it was its duty before the. acceptance of the ordinance
to safe-guard its rights in the matter.  ·

Assuming, however, for the sake of argument that the con-
tention of the gas company, regarding the ·proviso that Section

1 of Ordinance 1222 expressly incorporates Section 3 of the Conover contract, is correct, I am still of the opinion that the provisions of this Conover ordinance do not apply in the present case.   Section 3 of the Conover contract was a rate-making ordinance, and stated that in consideration of the grant the city was to have gas furnished it at two-thirds of the lowest average price at which gas was furnished to private individuals in the cities of New Orleans, Baltimore, New York, Louisville and Pittsburgh, the city on its part agreeing to furnish and pay all expense of lamp-post connecting pipes, meters and lamps.   In the absence of anything appearing to the contrary, it is not a violent assumption to say that the city agreed to pay for these connections on account of the special rate fixed for gas for street lighting purposes, and that this obligation was part and parcel of the whole scheme in the fixing of rates.

When the new ordinance fixing the rates at which the city was to be charged for natural gas was passed, this necessarily abrogated Section 3 of the Conover contract regarding rates and it can not be urged that it merely changed the rate part of the ordinance in the Conover contract and left in force the latter part of the ordinance requiring the city to make the connections at its own expense.   Either the whole clause is in force or none of it.   Of course the whole clause can not be in force for two reasons:

1.   The rate was for artificial gas as then furnished.   Now natural gas is furnished for which the rate was especially fixed under Ordinance 1223.

2.   The Conover contract was to exist for a period of twenty-five years or renewals thereof.   Under the statute the city can only fix the rate of gas now for a period of ten years.   This it has done under Ordinance 1223.

Inasmuch, therefore, as Ordinance 1222 reserves to the gas company its rights under existing contracts for supplying artificial gas and electricity, no provisions in such contracts putting a special obligation on the city to make connections at its own expense between the gas main and the inside curb line can apply where the gas company is operating under the natural gas ordi-

nance which does not contain such a provision. And further, if the proviso of the Conover contract is incorporated in the natural gas ordinance, such obligation on the part of the city was part of the rate fixing clause, and inasmuch as that has been altered without reserving this provision requiring at whose expense connections were to be made, the whole clause fails.

The city then, being a public consumer, is entitled to all the rights and privileges provided for in Ordinance 1222, and therefore, as under Section 3 of this ordinance the gas company must make all connections between the gas main and inside curb line to consumers. The city is entitled to have this done at the expense of the gas company. As the gas company would be required to pay for the cost of restoration, if connections were made to the curb line in order to furnish private consumers with gas, it would necessarily be required to pay a similar cost in restoration necessary where connection is made to furnish gas to the city as a public consumer under the ordinance.

A decree may be entered allowing the relief prayed for by the city.